IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CHELSEA MILLER,** | : | CIVIL ACTION NO. 1:23-CV-1729 |
| | : | |
| Plaintiff | : | (Judge Conner) |
| | : | |
| v. | : | |
| | : | |
| **METRO ONE LOSS PREVENTION SERVICES GROUP,** | : | |
| | : | |
| Defendant | : | |

# MEMORANDUM

Plaintiff Chelsea Miller brings this employment discrimination case against her former employer, defendant Metro One Loss Prevention Services Group ("Metro One"), alleging sex- and race-based harassment, as well as retaliation. She seeks back pay, front pay, compensatory and punitive damages, and attorneys' fees pursuant to Title VII of the Civil Rights Act of 1964 and the Pennsylvania Human Relations Act ("PHRA"). The Clerk of Court has entered default against Metro One, and Miller now moves for default judgment pursuant to Federal Rule of Civil Procedure 55(b)(2). We have conducted an evidentiary hearing on the matter, and we will grant Miller's motions and award her the requested relief.

## I. Factual Background & Procedural History[1]

Metro One is a corporation that provides security services to retail clients, with offices across the country. Miller, an African American woman, began working

---

[1] The following factual recitation is drawn from the allegations in Miller's uncontested complaint, (see Doc. 1), and the testimony that she offered at an evidentiary hearing on May 16, 2024, (see Doc. 11, 5/16/24 Hr'g Tr.).

for Metro One in Lewisberry, Pennsylvania, in March 2022 as an unarmed security guard. (See Doc. 1 ¶¶ 2, 8, 10). In that role, she earned approximately $16 per hour, though her pay was frequently late or not in the correct amount. (See 5/16/24 Hr'g Tr. 4:13-5:22). She worked full time, plus 8 to 10 hours of overtime "every week, if not every two weeks." (See id. at 4:16-21, 5:8-14). Miller's immediate supervisor was Cody Husken. (See Doc. 1 ¶¶ 9, 20; 5/16/24 H'rg Tr. at 24:4).[2] However, Husken did not communicate with Miller directly; his instructions to her always came through a coworker, Jaquan Murray. (See Doc. 1 ¶ 9).

While employed at Metro One, Miller experienced numerous instances of sexual harassment and racial discrimination. One coworker, Troy, made derogatory comments about Juneteenth, the federal holiday that commemorates the end of slavery in the United States, and referred to African Americans as "scumbags." (See id. ¶ 10; 5/16/24 Hr'g Tr. 23:6-21). As illustrated, comments and jokes about race were commonplace amongst Miller's coworkers, which spurred her to complain to Husken, who then referred her to Human Resources. (See 5/16/24 Hr'g Tr. 23:22-24:6). Another coworker, Dan, asked Miller to show him her breasts, made suggestive noises over a radio to her, and took pictures of Miller and other female employees without permission. (See id. ¶¶ 11-13). Miller reported this behavior to Human Resources, but Metro One undertook no remedial action and the behavior continued. (See id. ¶¶ 14-17). Dan yelled at Miller, stalked her social

---

[2] The complaint also refers to a "Toby Huskin," (see Doc. 1 ¶¶ 15, 19), which we assume is a typographical error in light of Miller's testimony.

media accounts, and relocated her to other worksites, even though doing so was beyond his authority. (See id. ¶¶ 16, 17).

On June 3, 2022, after Miller's superiors failed to respond to the incidents of discrimination and the harassment she was encountering, she offered her two-weeks' notice. (See id. ¶¶ 18, 20). The next day, Husken told her not to return to work. (See id. ¶¶ 19-20). On June 16, 2022, she was hired as a case manager assistant at Bell Socialization, where her hourly rate was just under $15. (See 5/16/24 Hr'g Tr. 6:3-25). Leaving her position at Metro One was a source of significant anxiety for Miller, who had experienced sexual abuse as a child and had been subjected to racism as an adult. (See id. at 21:1-4). She obtained therapy through her new employer to the extent it was free of charge, and then began seeing a provider not covered by her insurance. (See id. at 11:2-25, 12:1-11).

Miller filed her complaint against Metro One on October 17, 2023. Metro One failed to answer or otherwise respond to the complaint. As a result, the Clerk of Court entered default against Metro One on January 24, 2024. Miller filed a motion for default judgment and the court held an evidentiary hearing to assess damages on May 16, 2024. Metro One did not respond to the motion or appear at the hearing. The motion is ripe for disposition.

## II.     Discussion

Federal Rule of Civil Procedure 55 governs default judgments. See FED. R. CIV. P. 55. Once default has been sought and entered in accordance with Rule 55(a), the non-defaulting party may move for default judgment pursuant to Rule 55(b). See FED. R. CIV. P. 55(a), (b)(2). The court is entitled to take the facts in the

operative pleading—except those pertaining to damages—to be true for purposes of resolving the motion. See DIRECTV, Inc. v. Pepe, 431 F.3d 162, 165 n.6 (3d Cir. 2005) (quoting Comdyne I, Inc. v. Corbin, 908 F.2d 1142, 1149 (3d Cir. 1990)); 10A CHARLES ALAN WRIGHT & ARTHUR MILLER, FEDERAL PRACTICE & PROCEDURE § 2688.1 (4th ed. 2018) ("WRIGHT & MILLER) (citing, *inter alia*, Comdyne I, Inc., 908 F.2d 1142).  A district court considering a motion for default judgment must consider three factors: "(1) prejudice to the plaintiff if default is denied, (2) whether the defendant appears to have a litigable defense, and (3) whether the defendant's delay is due to culpable conduct." Chamberlain v. Giampapa, 210 F.3d 154, 164 (3d Cir. 2000).[3]  Whether to enter default judgment is left to the discretion of the district court.  See id.

---

[3] In Chamberlain, the panel cited to United States v. $55,518.05 in U.S. Currency, 728 F.2d 192 (3d Cir. 1984), for the proposition that these "[t]hree factors "control whether a default judgment should be granted." Chamberlain, 210 F.3d at 164 (citing $55,518.05 in U.S. Currency, 728 F.2d at 195).  That decision, however, and all other decisions cited therein were examining whether to *set aside* an entry of default or default judgment, not whether to *enter* default judgment. $55,518.05 in U.S. Currency, 728 F.2d at 195 (motion to set aside entry of default and default judgment) (citing Gross v. Stereo Component Sys., Inc., 700 F.2d 120, 122 (3d Cir. 1983) (motion to set aside default judgment); Feliciano v. Reliant Tooling Co., 691 F.2d 653, 656 (3d Cir. 1982) (same); Farnese v. Bagnasco, 687 F.2d 761, 764 (3d Cir. 1982) (motion to set aside entry of default)).  The Chamberlain decision does not explicitly acknowledge that it is extending the "set-aside" factors to a new and different context nor does it express a rationale therefor.  As one Third Circuit judge has observed, the actions of entering a default judgment and setting one aside are "clearly distinguishable," and the Chamberlain court "may have unwittingly imposed an unrealistic and misplaced burden on plaintiffs, and unduly constrained the discretion of district courts." Hill v. Williamsport Police Dep't, 69 F. App'x 49, 52-53 (3d Cir. 2003) (Rendell, J., concurring) (nonprecedential).  We echo and fully agree with Judge Rendell's concerns.  Common sense dictates that the burden of proffering a meritorious defense should fall upon the shoulders of a defendant who seeks to set aside a default; we see no justification for transposing that burden to a plaintiff seeking an entry of default judgment against a defendant who has failed to

4

Even when entering default judgment is appropriate as a matter of procedure, however, courts must examine whether the "unchallenged facts constitute a legitimate cause of action." See Pesotski v. Summa & Iezzi, Inc., No. 1:17-CV-221, 2017 WL 3310951, at *2 (M.D. Pa. Aug. 3, 2017) (quoting WRIGHT & MILLER § 2688); Martin v. Nat'l Check Recovery Servs., LLC, No. 1:12-CV-1230, 2016 WL 3670849, at *1 (M.D. Pa. July 11, 2016) (same).  We therefore begin by reviewing Miller's various claims, before tailoring appropriate relief to the circumstances she describes.

**A.     Merits**

The complaint sets forth nine counts, all of which invoke the protections of Title VII and the PHRA.[4]  Miller claims that Metro One discriminated against her based upon her race (Counts I and VII) and sex (Counts II and VIII), and retaliated against her for complaining about her treatment (Counts III, IV, VI, and IX).  (See Doc. 1 ¶¶ 24-93).  We address each category of claims *seriatim*.

---

appear.  Nonetheless, this court is bound by Chamberlain until and unless the Third Circuit revisits the decision *en banc*.  Id. at 52 (majority opinion) (observing that the district court "of course had no choice" but to follow Chamberlain); see, e.g., GEICO v. Pennsauken Spine & Rehab P.C., No. 17-11727, 2018 WL 3727369, at *4 n.1 (D.N.J. Aug. 6, 2018).

[4] Generally, courts construe the protections of the PHRA and the protections of Title VII as both parallel and interchangeable.  See Connelly v. Lane Constr. Corp., 809 F.3d 780, 791 n.8 (3d Cir. 2016) (citing Goosby v. Johnson & Johnson Med., Inc., 228 F.3d 313, 317 n.3 (3d Cir. 2000)); Hussein v. UPMC Mercy Hosp., 466 F. App'x 108, 111 (3d Cir. 2012) (nonprecedential) (quoting Fogleman v. Mercy Hosp., Inc., 283 F.3d 561, 567 (3d Cir. 2002)); Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996).

### 1. *Race discrimination*

To prevail on a claim of racial discrimination, a claimant must show that (1) they belong to a protected class; (2) they were qualified for their position; (3) they were subject to an adverse employment action; and (4) the action "occurred under circumstances that could give rise to an inference of intentional discrimination." See Makky v. Chertoff, 541 F.3d 205, 214 (3d Cir. 2008) (citing, *inter alia*, McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)).  Miller's unchallenged complaint presents facts that establish a legitimate cause of action for racial discrimination. Specifically—as supported by testimony which we find highly credible—Miller is (1) an African American who (2) was qualified to work as an unarmed security guard, (3) was subjected to a persistent hostile comments and jokes on the basis of her race before ultimately being terminated, and (4) experienced these difficulties under circumstances that lay bare Metro One's unwillingness to address the pervasive discriminatory behavior she encountered.  (See Doc. 1 ¶¶ 8, 10, 18-19, 21-22; 5/16/24 Hr'g Tr. 23:4-24:10); Greer v. Mondelez Global, Inc., 590 F. App'x 170, 172-73 (3d Cir. 2014) (nonprecedential) (citing, *inter alia*, Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 66-67 (1986); Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 270 (2001) (*per curiam*)).  Her testimony at the evidentiary hearing corroborates each and every element of this cause of action.

We conclude that all three Chamberlain factors weigh in Miller's favor.  She will be prejudiced if we decline to enter default judgment because she has suffered harms—both financially and emotionally—for which she is entitled to compensation.  Metro One's failure to respond to her allegations or appear at the

6

evidentiary hearing in this matter despite being notified hamstrings the court's ability to determine the availability of a litigable defense. And, absent any participation in this litigation whatsoever, we construe Metro One's failure to engage with Miller's allegations to be the result of culpable conduct. Thus, we conclude that entry of default judgment is appropriate against Metro One with respect to Counts I and VII.

### 2. *Sex discrimination*

Sex discrimination claims require a plaintiff to prove that (1) they suffered intentional discrimination due to a protected trait or activity; (2) the discrimination was severe or pervasive; (3) the discrimination had a detrimental effect; (4) which a reasonable person in like circumstances would experience; and that (5) *respondeat superior* liability is appropriate. See Andreoli v. Gates, 482 F.3d 641, 643 (3d Cir. 2007); Jensen v. Potter, 435 F.3d 444, 452-53 (3d Cir. 2006), overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006). Miller's complaint describes a supervisor making sexualized remarks about her chest; discussing her figure and other women's bodies with coworkers on a regular basis; stalking her social media accounts; and moaning suggestively over a radio. (See Doc. 1 ¶¶ 11-13, 17; 5/16/24 Hr'g Tr. 14:18-21). We find that these alleged incidents reflect (1) harassment based upon traits Miller embodies as a woman; (2) in a manner so severe and pervasive as to create an abusive working environment given the frequency and extent of the harassment; (3) to the detriment of Miller's mental and emotional state, especially in light of her personal experiences with sexual abuse; (4) and to a degree that a reasonable person in such circumstances would

7

suffer detrimental effects. The unchallenged *allegata* and Miller's testimony also establish that (5) such harassment continued after Metro One became aware of it but failed to take remedial action. (See id. ¶¶ 17-18, 21-22; 5/16/24 Hr'g Tr. 21:1-4); Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (describing abusive work environment discrimination claims); Kunin v. Sears Roebuck & Co., 175 F.3d 289, 293-94 (3d Cir. 1999) (*respondeat superior* liability when employer "knew or should have known of the harassment and failed to take prompt remedial action") (citations omitted). Miller's testimony at the evidentiary hearing establishes each and every element of this claim. The conduct of Miller's coworkers goes beyond "mere offensive utterance[s]," or one-off jokes. See Breeden, 532 U.S. at 271. They—and Dan in particular—subjected her to sexually charged humiliation and invasions of her privacy as a condition of her employment at Metro One. (See Doc. 1 ¶¶ 11-13).

Again, the Chamberlain factors favor Miller. She has suffered harm and is entitled to compensation, such that denying her motion would be prejudicial. Metro One's failure to appear or respond makes it difficult to discern any litigable defenses. And we may infer that Metro One's delay is the result of culpable conduct. See Chamberlain, 210 F.3d at 164. Accordingly, we find that entry of default judgment is appropriate against Metro One with respect to Counts II and VIII.

    3.    ***Retaliation***

To prevail on a retaliation claim, a plaintiff must demonstrate that (1) they engaged in a protected activity; (2) they were subject to an adverse action after

8

engaging in that activity; and that (3) there is a causal link between the protected activity and the adverse action.  See Sarullo v. U.S. Postal Serv., 352 F.3d 789, 800 (3d Cir. 2003) (*per curiam*) (citing Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997)).  The unchallenged *allegata* establish that Metro One retaliated against Miller for reporting her experiences with sexual and racial discrimination in the workplace.  More specifically, the complaint and Miller's credible testimony demonstrate that (1) Miller engaged in the protected activity of reporting her coworkers' hostile behavior—which she reasonably believed constituted unlawful conduct under state and federal law[5]—to her superiors; (2) Metro One terminated her immediately after she gave notice of her intent to resign in light of her treatment; and (3) an inference of causation is appropriate given the suggestive temporal proximity between the protected action and the alleged retaliatory action, as well as an apparent pattern of antagonism.  (See Doc. 1 ¶¶ 8, 19-22; 5/16/24 Hr'g Tr. 23:6-24:9); Dondero v. Lower Milford Township, 5 F.4th 355, 361-62 (3d Cir. 2021) (citing Lauren W. *ex rel* Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007)).

Once more, the Chamberlain factors support granting default judgment.  Miller was terminated from her position with Metro One, causing financial and personal stress for which she is entitled to compensation.  Her employer's failure to offer defenses or a reply of any kind stymies our ability to discern available

---

[5] See Daniels v. Sch. Dist. of Phila., 776 F.3d 181, 193-94 (3d Cir. 2015) (citations omitted).

defenses, and none are apparent on the face of the complaint or the evidentiary record. And, again, it is reasonable to conclude under the circumstances that Metro One's failure to respond to her allegations results from culpability. See Chamberlain, 210 F.3d at 164. Thus, we find that Miller is entitled to default judgment on Counts III, IV, VI, and IX, as well.

### B.    Damages

Miller seeks various forms of compensatory damages, punitive damages, and reimbursement for medical bills. (See Doc. 1 at 13-14). Rule 55(b) states that default judgment is proper when a plaintiff's claim "is for a sum certain or a sum that can be made certain by computation." See FED. R. CIV. P. 55(b)(1). However, a plaintiff cannot satisfy the sum certain requirement simply by specifying an amount. See Butler v. Experian Info. Sol., No. 14-7346, 2016 WL 4699702, at *1 n.2 (E.D. Pa. Sept. 7, 2016) (citing WRIGHT & MILLER § 2683). The amount must be reasonable under the circumstances. See Holliday v. Cabrera & Assocs., P.C., No. 05-971, 2007 WL 30291, at *1 (E.D. Pa. Jan. 4, 2007). Therefore, while Miller calculates her damages in excess of $150,000, (see Doc. 1 at 13), the court will formulate its own figure in light of the circumstances, as explained below.

#### 1.    *Back Pay and Front Pay*

Miller's first request for damages is in the form of front and back pay. Back pay makes "victims of unlawful discrimination whole by restoring them to the position they would have been in absent the discrimination." See Donlin v. Philips Lighting N. Am. Corp., 581 F.3d 73, 84 (3d Cir. 2009) (citing Loeffler v. Frank, 486 U.S. 549, 558 (1988)). Front pay is an equitable remedy available under both Title

10

VII and the PHRA, and it serves as an alternative to reinstatement.  See Witbeck v. Equip. Transp., LLC, No. 1:17-CV-498, 2022 WL 625719, at *2 (M.D. Pa. Mar. 3, 2022) (Conner, J.) (citations omitted).[6]  Unlike back pay, it compensates "future lost earnings" arising from wrongful termination.  See generally Goss v. Exxon Office Sys. Co., 747 F.2d 885, 890 (3d Cir. 1984).

Miller calculates her back pay at approximately $1,280, which represents roughly two weeks' wages and accounts for the time between her termination on June 4, 2022, and her hiring at Bell Socialization on June 16, 2022.  (See Doc. 9 at 3). Consistent with well-established methods for calculating back pay,[7] this calculation represents Miller's actual wages subtracted from what she would have earned had she not been unlawfully terminated, and they do not extend beyond her attainment of a similar position.  We accordingly find that $1,280 of back pay is appropriate.

Miller calculates her front pay at approximately $4,160, which we understand represents the difference between her anticipated earnings at Metro One and her actual earnings at Bell Socialization following her termination.  (See id.)  Courts

---

[6] The choice between reinstatement and other equitable relief is left to the sound discretion of the district court, and we must consider whether reinstatement is feasible based upon the relationship between the parties.  See Feldman v. Phila. Hous. Auth., 43 F.3d 823, 831-32 (3d Cir. 1994), as amended (Jan. 23, 1995) (citing, inter alia, Blum v. Witco Chem. Corp., 829 F.2d 367, 373-74 (3d Cir. 1987)).  Here, we find beyond serious contention that the relationship between Miller and Metro One is irreparable, as evidenced by her brief tenure there.  (See Doc. 1 ¶¶ 8, 18-19).

[7] See Gunby v. Pa. Elec. Co., 840 F.2d 1108, 1119-20 (3d Cir. 1988) (citing E.E.O.C. v. Eazor Express Co., 499 F. Supp. 1377, 1388 (W.D. Pa. 1980) (subtract actual wages earned from anticipated wages), aff'd, 659 F.2d 1066 (3d Cir. 1981) (unpublished table decision)); Donlin, 581 F.3d at 84 (back pay ends when plaintiff finds new equivalent employment) (citation omitted).

11

consider a variety of factors when calculating an appropriate front-pay award, see, e.g., Donlin, 581 F.3d at 88; Bianchi v. City of Philadelphia, 80 F. App'x 232, 237 (3d Cir. 2003); Hosler v. Jay Fulkroad & Sons, No. 1:13-CV-1153, 2015 WL 3865877, at *13 (M.D. Pa. June 23, 2015) (Carlson, M.J.) (collecting cases), and Miller's calculations account for them all, including her efforts to mitigate the harm occasioned by her unexpected termination and the likelihood she would have been able to remain in her position.[8]  Thus, $4,160 of front pay is also appropriate under the circumstances.

### 2. *Compensatory Damages*

Miller next seeks compensatory damages.  Compensatory damages in the Title VII and PHRA contexts account for "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses."  See 42 U.S.C. § 1981a(b)(3).  While a plaintiff need not present medical evidence or expert testimony to demonstrate that they are entitled to compensation for "mental distress," they must put forth evidence that they have suffered an "actual injury" because of the defendant's misconduct.  See Bolden v. Se. Pa. Transp. Auth., 21 F.3d 29, 34 (3d Cir. 1994); Gunby, 840 F.2d at 1121 (citing, *inter alia*, Carey v. Piphus, 435 U.S. 247 (1978)).

---

[8] Subtracting Miller's hourly rate at Bell Socialization ($14.94) from her hourly rate at Metro One ($16) results in a difference of $1.06 per hour.  That difference, multiplied by 40 earning hours, equals a difference of $42.40 per week.  That weekly difference, multiplied by the number of weeks between Miller's termination and the filing of her motion, equals roughly $4,160.

Though Miller requests a specific dollar amount in her complaint, she does not delineate how much of that sum would represent compensatory damages. (See Doc. 1 at 13-14 (prayer for relief)). The complaint alludes to medical bills, (see id.) and the record includes an accounting of two "Missed/Cancelled Appointment Fee[s]," each of which cost $70, (see Doc. 9-5, Ex. E at 21-22). But we do not have a complete accounting of Miller's treatment that is not covered by her insurance with Bell Socialization, (see id. at 12:1-10). Consequently, we will award $140.00 for cancellation fees but we will not award additional damages for medical expenses that are not covered by insurance.

With respect to Miller's mental anguish, the court notes that medical records establish she experienced "anxiety and depression" as a result of her tenure at Metro One, as well as "chest pains, frequent crying," and feeling a lack of self-worth. (See id. at 13:13-22, 21:11-17). At the hearing, she also mentioned that the ordeal "triggered her insomnia," and made her seek out therapy, which she had not done since she was a teenager. (See id. at 14:5-15:9). Miller recounts both racial and sexual harassment in the workplace, stress from not being paid, serious invasions of privacy, and pervasive abusive language from coworkers. (See id. at 21:18-22:2; Doc. 1 ¶¶ 10-13, 17). We find this testimony highly credible. Accordingly, we conclude that she is entitled to at least emotional distress damages. See Sowell v. RAV Investigative & Sec. Servs., Ltd, No. 15-3657, 2016 WL 3014881, at *6 (E.D. Pa. May 26, 2016) (quoting Joseph v. HDMJ Rest., Inc., 970 F. Supp. 2d 131, 153 (E.D.N.Y. 2013) (collecting cases)).

On the other hand, we acknowledge that Miller was an employee at Metro One for only a short time, approximately three months.  (See Doc. 1 ¶¶ 8, 19).  Her testimony establishes that she had (to some extent) pre-existing trauma, anxiety, and depression, which were exacerbated—as opposed to induced—by her troubling experiences at Metro One.  (See 5/16/24 Hr'g Tr. 14:5-9 (prior diagnosis of depression); id. at 26:3-14 (alluding to history of trauma)).  Moreover, she was able to secure a job at Bell Socialization within a few weeks of her termination at Metro One, albeit for a slightly lower wage at first; she now makes $18.40 per hour following a promotion.  (See id. at 6:2-20, 7:2-18).  We must therefore tailor the amount of damages to account for the seriousness of the offenses, without losing sight of her limited tenure and how commendably Miller has mitigated the harm that befell her.

Surveying comparable emotional distress cases—in which awards typically fall between $5,000 and $35,000—we find that an award in the middle of that range is appropriate.  See Hampton v. Prot. Plus Sec. Corp., No. 3:14-CV-6982, 2017 WL 714351, at *5 (D.N.J. Feb. 23, 2017) (awarding $10,000 where plaintiff testified that employer's racial discrimination caused him anxiety, depression, and fear); Thompson v. Cent. Sec. Agency, Inc., No. 98-2474, 1999 WL 126918, at *3 (E.D. Pa. Mar. 8, 1999) (awarding $10,000 where plaintiff testified that employer constructively terminated her after supervisor sexually harassed her, causing her to feel scared, embarrassed, and depressed); cf. Bugg v. Just Wing It, LLC, No. 1:18-CV-2399, 2020 WL 1675953, at *6 (M.D. Pa. Apr. 6, 2020) (awarding $20,000 where plaintiff-customer suffered racial discrimination that

caused embarrassment and humiliation). As discussed, Metro One's treatment of Miller caused her significant mental anguish, triggered feelings of anxiety, stress, and depression, and demeaned her based upon both her skin color and her sex. She incurred obvious difficulties and distress while employed there and since her termination. Accordingly, we will award Miller $20,000 in emotional distress damages, in addition to the $140 for her cancellation fees.

    3.    ***Punitive Damages***

In her penultimate request, Miller seeks punitive damages. Punitive damages are available in employment actions if a defendant engaged in discriminatory conduct with malice or reckless indifference. See 42 U.S.C. § 1981a(b)(1). That is, the employer's conduct must amount "to something more than a bare violation justifying compensatory damages." See Cochetti v. Desmond, 572 F.2d 102, 106 (3d Cir. 1978). Courts may consider a defendant's assets, net worth, and financial condition when calculating a punitive damages award. See Johnson v. Fed. Express Corp., No. 1:12-CV-444, 2014 WL 805995, at * 2 (M.D. Pa. Feb. 28, 2014) (Conner, C.J.) (citing, *inter alia*, Forsyth v. Kleindienst, 700 F.2d 104, 106 (3d Cir. 1983)). And they may consider the ratio of that award to the "actual harm" or compensatory damages the plaintiff sustained. See CGB Occupational Therapy, Inc. v. RHA Health Servs., Inc., 499 F.3d 184, 188-89, 192 (3d Cir. 2007) (courts must consider ratio of punitive damages to "actual harm") (citing, *inter alia*, BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 580 (1996)).

We find that punitive damages are appropriate. Miller's uncontested allegations depict a working environment in which she was not treated as an equal

15

and her coworkers harassed and demeaned her with impunity. (See Doc. 1 ¶¶ 18, 20-22). Given how targeted and menacing in nature some of the underlying conduct was, (see id. ¶¶ 12-13, 17), these facts present something more than a bare violation of relevant state and federal protections, see Cochetti, 572 F.2d at 106. An award of punitive damages equal to Miller's compensatory damages is warranted. See Bugg, 2020 WL 1675953, at *7 (finding one-to-one ratio appropriate). We will award Miller $20,000 in punitive damages against Metro One.

### C. Attorneys' Fees and Costs

Lastly, Miller seeks attorneys' fees and costs. In general, courts have discretion to award reasonable attorneys' fees, which are available to a plaintiff who prevails on civil rights claims and obtains the sought-after relief. See 42 U.S.C. § 2000e-5(k); Sullivan v. Pa. Dep't of Lab. & Indus., Bureau of Vocational Rehab., 663 F.2d 443, 447 (3d Cir. 1981). Our court of appeals has held that the legal standards for Section 1981 and Title VII cases are the same. See Gunby, 840 F.2d at 1115 & n.9. The common formula for such fees multiplies the number of hours reasonably expended by a reasonable hourly rate, see Hensley v. Eckerhart, 461 U.S. 424, 433 (1983); Maldonado v. Houstoun, 256 F.3d 181, 184 (3d Cir. 2001), which in turn depends upon the skill, experience, and reputation of the attorney in question, see Interfaith Cmty. Org. v. Honeywell Int'l, Inc., 426 F.3d 694, 708 (3d Cir. 2005), as amended (Nov. 10, 2005).

As the prevailing party, Miller is entitled to reasonable attorneys' fees and costs. She estimates that she has spent $4,000 in bringing this suit, and she has supplied documents that outline a fee agreement with her lawyer. (See Doc. 9 at 3;

16

Doc. 9-7, Ex. G). In light of the hourly rate that agreement sets, (see id. at 2), and our familiarity with rates charged by comparable counsel in the Middle District of Pennsylvania for similar services, we find the requested fee to be eminently reasonable. We will grant Miller's request and award her $4,000 in attorneys' fees and costs.

### III. Conclusion

We will grant Riley's motion for default judgment and award her damages and relief as outlined above. An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:   August 19, 2024